FILED
AUG 2 5 2005
U.S. COURT OF FEDERAL CLAIMS

# In the United States Court of Federal Claims

| | |
|---|---|
| VT GRIFFIN SERVICES, INC., Plaintiff, v. THE UNITED STATES of AMERICA, Defendant. | Case No. Judge |

## COMPLAINT

Plaintiff VT Griffin Services, Inc. ("GSI"), by counsel, submits this Complaint.

## PARTIES

1. The Plaintiff in this case is GSI, a Georgia corporation with its principal place of business in Atlanta, Georgia.

2. The United States is the Department of the Army, Army Contracting Agency, Southern Region, Southern Region Contracting Center (the "Army").

## JURISDICTION

3. This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a), and the Contract Disputes Act, 41 U.S.C. § 609(a)(1). GSI timely files its complaint in this Court eleven months after September 19, 2004, the date the Army contends the Contracting Officer issued her final decision. Therefore, GSI files this complaint within the twelve-month statute of limitations mandated by the Contract Disputes Act, 41 U.S.C. § 609(a)(3).

B. the Army breached the Contract by failing to pay a reasonable award fee properly earned by GSI; and,

C. the Army breached the Contract by failing to equitably adjust the award fee or contract price to account for the cumulative impact of additional work and the Army's disruptive conduct, which hindered GSI's performance; and,

D. that GSI is entitled to payment of an amount to be determined at trial, which shall total at least $280,747.00, together with any interest or attorneys' fees to be awarded under the Contract Disputes Act and Equal Access to Justice Act, and such other relief as the Court deems proper.

Respectfully requested,

Lars E. Anderson
VENABLE, LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 821-8949

Dated: August 25, 2005

4. On July 20, 2004, GSI sent the Contracting Officer, Ms. K. Jan. Stowell, a claim for equitable adjustment for eight items.

5. On September 19, 2004, the Contracting Office sent GSI a letter explaining that the Government agreed and approved the first seven items but denied the eighth.

6. On May 10, 2005, after numerous exchanges in person and by correspondence regarding both GSI's Performance Assessment Report ("PAR") and its eighth claim for equitable adjustment, GSI filed an appeal to the Armed Services Board of Contract Appeals ("ASBCA" or "the Board") pursuant to the Contract Disputes Act.

7. The Army sought and was granted multiple delays in responding to GSI's complaint and in submitting the Rule 4 file to the Board.

8. On July 29, 2005, the Army filed its Answer and Motion to Dismiss, arguing that the ASBCA lacks jurisdiction because GSI "failed to file its notice of appeal with the Board within 90 days of receipt of the contracting officer's final decision [of September 19, 2004]."

9. Accepting the Army's contention that GSI's complaint at the ASBCA is untimely, GSI withdrew its appeal from the Board and asserts its right to file a complaint in this Court. A plaintiff may appeal to the United States Court of Federal Claims from an agency decision when, as in this case, an appeal to the ASBCA would be deemed untimely. *See Olsberg Excavating Co. v. United States*, 3 Cl. Ct. 249, 252 (1983) ("The plain terms of section 10(a)(1) of the 1978 [Contract Disputes Act] gave plaintiff a right, 'in lieu of' appealing to the board in a timely fashion, to bring an action in this court (within the congressionally prescribed time limit for so doing)."); *Nat'l Neighbors v.*

**COUNT III**
**Breach Of Contract**

(Failure To Equitably Adjust The Award Fee)

54. GSI incorporates each allegation in the preceding paragraphs as if fully set forth herein.

55. Throughout GSI's performance, the Army made numerous unilateral changes that increased the amount of work performed by GSI, the amount of time required to perform, and the costs for performance.

56. In addition, the Army failed to cooperate with GSI to facilitate Contract performance and engaged in conduct that actually hindered GSI's performance.

57. The Army's changes and conduct caused disruptions and delays that impeded Contract performance through no fault of GSI.

58. The Army failed to consider the cumulative impact of the additional work and the Army's disruptive conduct when determining the award fee.

59. As a result, the Army's award fee determination was unreasonably low and failed to comply with the Contract.

60. The Army has refused to grant an equitable adjustment to increase the award fee or otherwise compensate GSI to account for the cumulative impact of the additional work, disruptions, and delays caused by the Army.

**PRAYER FOR RELIEF**

WHEREFORE, GSI respectfully requests the Court to find that:

A. the Army breached the Contract by failing to properly perform required evaluations and communicate with GSI; and,

*United States*, 839 F.2d 1539, 1542 (Fed. Cir. 1988) ("A contractor's choice of forums in which to contest the contracting officer's adverse decision is a binding election, under the Election Doctrine, *only* if that choice truly is available. An untimely appeal to the board is not a choice that truly is available; an untimely appeal to the board is an absolute nullity because the board lacks jurisdiction over such an appeal.") (citations omitted).

**STATEMENT OF FACTS**

10. On October 13, 2000, after conducting an Office of Management and Budget ("OMB") Circular A-76 procurement, the Army awarded GSI Contract Number DAKF11-00-C-0006 (the "Contract") to provide Installation Support Services at Fort McPherson, Fort Gillem and the U.S. Army Recreational Area Lake Allatoona—all located in the state of Georgia. The Contract was awarded on a cost-plus-award-fee basis, according to which the amount of the award fee was determined based on the Army's evaluation of GSI's performance. The Contract provided for a period of performance of one base year plus four option years, for a total duration of five years. The Contract also provided for a Phase-In period of approximately three (3) months, commencing on March 1, 2001.

11. Shortly after the Contract was awarded, however, the Army requested that GSI accelerate the phase-in period and assume full performance earlier than originally contemplated because of the unanticipated departure of many of the Government personnel that were expected to perform the required services until GSI took over the Contract.

12. Accordingly, during December 2000 and early January 2001, GSI engaged in negotiations with the Army over both the phase-in period and full performance dates,

45. The Army has failed to meet with GSI "to discuss the results of the evaluation" and to "openly and frankly" discuss any performance shortcomings and successes, as required by the Contract.

46. To the extent the Army performed any evaluations, those evaluations were inaccurate, arbitrary and unreasonable.

47. The failure to adequately and reasonably disclose the perceived deficiencies in GSI's performance deprived GSI of an opportunity to timely correct errors by Government evaluators and/or to take appropriate corrective action.

**COUNT II**
**Breach Of Contract**

(Failure To Pay Total Award Fee Earned By GSI)

48. GSI incorporates each allegation in the preceding paragraphs as if fully set forth herein.

49. When the Army requested that GSI accelerate the start of performance and shorten the phase-in period, GSI and the Army identified a number of performance problems that would be created.

50. The Army unreasonably downgraded GSI for the very same performance problems that were attributed to the acceleration of the contract performance and abbreviated phase-in period.

51. The Army recommended deductions from the award fee that were arbitrary, indiscriminate and without reasonable justification.

52. As a result, the Army failed to demonstrate entitlement to deductions from the award fee.

53. The Army has refused to pay any additional award fee to GSI, notwithstanding the fact that GSI properly earned additional award fee.

eventually agreeing to begin phase-in on January 16, 2001 and commence full performance of the Contract on March 1, 2001. This resulted in an accelerated start and phase-in period of only about six weeks, instead of a phase-in of four months required by the original Contract.

13. Modification P00001 accelerated the performance of specified tasks, accelerated the performance start date, added costs for phase-in and the accelerated portions of the Contract, and increased the total estimated amount of the Contract, among other things.

14. Modification P00002 revised the Performance Work Statement ("PWS"), incorporated new Department of Labor Wage Determinations, added required Clauses to the Contract, and added new reporting requirements, among other things. Both Modifications were bilateral agreements negotiated by the parties.

15. After the accelerated and abbreviated phase-in, GSI commenced full performance of the Contract on March 1, 2001. GSI made the immediate and unwelcome discovery that the Army personnel responsible for administering the Contract resented the fact that the OMB A-76 procurement process resulted in the services being converted from Army personnel to GSI and therefore were hostile to GSI taking over the Contract. As a consequence, GSI was faced with having to perform in an environment marked by defiance, obstruction, and a total lack of cooperation. In fact, only one hour into performance of the accelerated Phase-In, GSI received what amounted to a cure notice from the Fee Determination Official, who sent an e-mail that began with the observation that "[w]hile I understand that we are very early in the accelerated phase-in of the Contract the initial indications are not very good." The e-mail went on to identify the

the award fee adjustment....By letter dated 10 May 2005, GSI filed the notice of appeal, which is nearly 224 days from receipt of the final decision. GSI was required to file its appeal on or by 27 December 2004."

41. The Army's July 29, 2005 Motion and Supporting Contracting Officer's Affidavit was the first indication that the Army considered the Contracting Officer's September 19, 2004 letter as being the definitive Final Decision under the Contract Disputes Act, notwithstanding the subsequent communications between the parties.

42. GSI finds no value in disputing the Army's assertion that the Contracting Officer issued a final decision in this matter on September 19, 2004 and never considered reopening the decision despite the subsequent communications between the parties. By doing so, GSI would be required to await the ASBCA's decision on the Army's motion to dismiss and so would risk the right to file in this Court within the twelve-month statute of limitations set forth at 41 U.S.C. § 609(a)(3). On the narrow question of forum, GSI therefore accepts the Army's assertion that GSI's appeal to the ASBCA is untimely and withdraws its ASBCA claim. As such, per the clear precedent of *Olsberg Excavating* and *Nat'l Neighbors*, *supra*, GSI invokes its right to file a complaint in this Court.

**COUNT I**
**Breach Of Contract**
(Failure To Properly Perform Required Evaluations And Meet With GSI)

43. GSI incorporates each allegation in the preceding paragraphs as if fully set forth herein.

44. The Army failed to perform all monthly and quarterly evaluations in accordance with the Contract terms.

very same start up issues that had been the subject of discussions during the negotiations that took place throughout December and early January when the parties were discussing the terms for the performance accelerations and shortened phase-in period.

16. Such antipathy continued throughout GSI's performance, as demonstrated by a staff meeting that took place the following year. The staff meeting was attended by the Garrison Commander at Fort McPherson, GSI's Project Manager, and the Contracting Officer's Representative ("COR"), among other personnel. At that meeting, the Garrison Commander asked the COR "[h]ow do you communicate with the contractor?" The COR responded "[w]ith CDRs [Contract Deficiency Reports]."

17. Throughout Contract performance, the Army unreasonably downgraded GSI's performance for delays caused by the Government or for the purported failure to perform work or provide equipment that clearly was not part of the Contract and that was based on the Army's unreasonable interpretation of the Contract. For example, the Contract required GSI to mow specified grounds areas but contained no requirement that GSI edge the areas that it mowed. Moreover, the Army had at least one active contract with a local contractor that included the requirements for edging.

18. Notwithstanding the fact that edging services were not part of GSI's Contract, and were provided under other contracts with other contractors, the Army nevertheless held GSI accountable for performing edging services. Furthermore, although the Contract stated that GSI was required to mow improved grounds a maximum of once per week during the summer months, the Army nonetheless demanded that GSI mow such areas, including a parade field, three times a week or more. Particularly telling is the fact that the Army's mandate for more frequent mowing was

about how we can close out the [Performance Assessment Report] and this last claim – I am willing to listen and discuss."

34. On November 11, 2004, Mr. Gulino responded to inquire about meeting to discuss the certified claim.

35. On December 30, 2004, Mr. Gulino wrote the Contracting Officer again. He stated to the Contracting Officer that "[w]e seem to be losing momentum on arriving at an agreement on all outstanding issues; I am hopeful to resolve these in a meeting as you suggested."

36. The same day, on December 30, 2004, the Contracting Officer responded via e-mail, "Hi Michael, we're not losing momentum, just taking leave. Let's meet one day next week and iron out the Performance Assessment Report…."

37. In early 2005, Mr. Gulino and the Contracting Officer met. No resolution was reached on either the Performance Assessment Report or the claim for equitable adjustment.

38. GSI believed that the communications between the parties subsequent to the September 19, 2004 Contracting Officer's letter constituted a reconsideration or reopening of the Final Decision. When all efforts to resolve the claim appeared futile, GSI appealed the matter to the ASBCA on May 10, 2005.

39. The Army repeatedly sought and was granted extensions in time to file its Rule 4 file and Answer to GSI's complaint.

40. Finally, on July 29, 2005, the Army moved to dismiss GSI's appeal to the ASBCA, on the ground that the Contracting Officer "issued a final decision on 19 September 2004, which approved the first seven claims and denied the eighth claim for

based on a standard calling for the maintenance of grass at a specific height. Meanwhile, the Contract contained no such requirement and, instead, required only that GSI mow at designated intervals (depending on the season) with the mower equipment set to a specified height—not that the grass itself be maintained at a specific height.

19. The Army also required GSI to, among other things, monitor and treat swimming pool water, trim plants, move and clean areas outside the base, and clean leaves from the nature trail on a daily basis. None of this work was required by the Contract.

20. GSI also was required to perform contingency and special events support services that exceeded the labor, time and performance costs of the Contract. The Army also arbitrarily and unreasonably failed to comply with its own Quality Assurance Plan ("QASP") during Contract performance, which was a document that outlined the parameters for GSI's performance and how the Army would inspect the performed services.

21. When GSI notified the Army Contracting Officer that Contract Deficiency Reports were being improperly issued in violation of the QASP because, for example, GSI's level of performance in fact met the required parameters, the Contracting Officer responded by stating in an e-mail dated September 12, 2002 that the QASP "could be changed five times a day if I want to," indicating her unreasonable interpretation that the Army need never comply with the existing plan because it could be changed at will in the future to suit the Army. As a result of the Army's failure to follow the guidance outlined in the QASP, GSI was subjected to arbitrary and unreasonable award fee determinations.

30. On September 19, 2004, the Contracting Officer sent a letter to GSI stating that the Army was in receipt of GSI's claim in the amount of $434,921.00. The Contracting Officer stated that the "Government agrees and approves" the equitable adjustments for the first seven items, totaling $154,276.00" but denies the equitable adjustment for item eight. The Contracting Officer also claimed that this letter was "the final decision of the Contracting Officer" and that "appeal must take place within 90 days from the date you receive this decision."

31. On September 28, 2004, GSI wrote the Contracting Officer to explain that GSI accepted the Government's final decision with regard to the first seven claims for equitable adjustment. With regard to the Government's decision on the eighth and final claim, GSI stated that, instead of immediately appealing to the ASBCA, GSI would send the Contracting Officer additional support for its eighth claim. GSI stated that "[t]his information will be provided within a couple of days. We trust that you will give this additional information fair consideration and modify your Final Decision accordingly."

32. Two days later, on September 30, 2004, GSI provided the additional support it promised. In an eleven-page letter to the Contracting Officer, GSI's President and Chief Operating Officer, Mr. Michael L. Gulino, explained why GSI was owed an equitable adjustment as a result of a cardinal change to the contract. This letter contained a certified claim and request for a Contracting Officer's Final Decision seeking an award fee adjustment in the amount of $280,747.00, as well as damages for breach of contract.

33. On November 10, 2004, after numerous exchanges with Mr. Gulino, the Contracting Officer sent Mr. Gulino an e-mail. She wrote, "If you have any suggestions

The Army also failed to comply with the Contract by performing required evaluations and meeting with GSI to discuss those evaluations.

22. The Contract stated that "[t]he amount of the award fee earned for each evaluation period . . . shall be determined by the Government's subjective evaluation of the Contractor's performance." Clause H.3. Accordingly, the Army was required to evaluate GSI's performance before making any determination about the award fee earned.

23. The Contract went on to describe the performance criteria that would serve as the basis for determining the amount of the award fee, including (1) performance of work, (2) quality control, (3) technical management, (4) business management, and (5) budget and cost control. *Id.*

24. There also were numerous subfactors identified under each performance criteria that also were required to be considered. *Id.*

25. The Contract further stated:

> The Government will perform a monthly evaluation of the Contractor's performance according to criteria stated above. The Government may elect to allow the Contractor's input in the monthly evaluation if the Government deems such input would clarify or explain significant occurrences or Contractor actions. It is anticipated that evaluations will be conducted quarterly. After evaluation is complete the Government will meet with the Contractor to discuss the results of the evaluation. The intent of this meeting is to reach a common understanding of the level and adequacy of the contractor's performance. Contractor performance shortcomings and successes will be openly and frankly discussed with the overall intent of improving mission support. The Government may provide recommendations on methods for performance improvement, however acceptance or implementation of any such recommendation rests solely with the Contractor and shall [not] relieve the Contractor from the requirement of meeting any or all requirements of the contract.

*Id.*

26. Contrary to the terms of the Contract as quoted in the preceding paragraph, the Army failed to meet with GSI quarterly "to discuss the results of the evaluation." In fact, GSI repeatedly requested written documentation regarding the Army's award fee determinations, but the Army refused to provide such documentation to GSI. Thus, GSI was deprived of meaningful opportunities to address Army criticism and/or take appropriate corrective action.

27. On January 25, 2002, after numerous written requests for documentation relating to previous award fee determinations, GSI's Director of Operations submitted a formal request for a Contracting Officer's Final Decision regarding the documentation for the award fee determinations. The Contracting Officer ignored the request and never provided a Final Decision. Without issuing a Contracting Officer's Final Decision, the Army eventually provided GSI with documentation covering only the September 2001 through November 2001 award fee period, which was the period immediately preceding GSI's request. This evaluation documentation was replete with inaccurate characterizations of GSI's performance as it related to the actual Contract requirements.

28. The Army eventually terminated GSI's Contract for its own convenience. Accordingly, GSI's performance concluded on February 28, 2003.

29. On July 20, 2004, GSI submitted to the Contracting Officer a claim for equitable adjustment for eight items totaling $434,921.00. GSI sought equitable adjustment, among other things, for supplies and materials purchases required during performance, litter removal, swimming pool water treatment, boiler work changes, and "total contract fee adjustment as a result of a cardinal change to the contract."