AFZK-IS-OF 21 Aug 01

MEMORANDUM FOR Commander, FORSCOM, Army Atlanta Contracting Center, ATTN: AFLG-PRC (Mr. Jesse Watkins), Building 130, 1301 Anderson way, Fort McPherson, GA 30330-6000

SUBJECT: Consolidated Performance Evaluation for DAKF11-00-C-0006, Performance Period 1 July – 31July 2001.

1. Enclosed is the supporting documentation for the performance evaluation period beginning 1 July and ending 31 July 2001 submitted by the Installation Service Support Center, Fort McPherson, GA.

2. Based on this summary (encl attached), the overall performance for the month of July 2001, meets contract requirements. The rating for this period is 70.19 % (SATISFACTORY), supported by the enclosed documentation. This report is a compilation of data from personal observation, customer comments, and observations from government managers, functional experts and government Quality Assurance Evaluators. A summary of raw scores is shown as Encl 1.

3. The Contractor has completed five (5) months at the contract full performance level. Some of the same problems continue to persist although there has been a marked improvement in the communication channels between the contractor's Project Management Office and the government management teams. Improvement in most work centers has occurred. On site management initiatives by the contractor in the areas of problem prevention and/or resolution has become evident. There has been a noticeable display of cooperation and proactive initiatives from the Project Manager to project a one-team organization between the contractor and the government.

4. Evaluations for each work center are provided below:

I. Performance of Work:

a. Real Property and Facilities Maintenance: (Satisfactory 70%)

(1) Real property and facilities maintenance operations have improved even though there are still some issues that have not been resolved completely. Implementation for corrective action is noticeable on these issues however.

(2) Timeliness and responsiveness of work and work site clean up has improved.

(3) Customer complaints have decreased slightly.

(4) Boiler and generator mechanics should be reminded of the importance of following proper maintenance procedures in order to preclude damage to the equipment since that was an area that was not satisfactorily performed this rating period.

(5) Overall workmanship and diagnostic work has improved and for the most part is at least minimally satisfactory in most work centers.

(6) The contractor has provided his Preventative Maintenance Plan (PM) however, has still not accomplished the task of providing his PM schedule for the work centers in this functional area. PM scheduling should be a priority requirement and accomplished immediately. Lack of a published, PM schedule has caused some preventable problems.

Recommend:
The contractor's supervisory staff ensures that preventative maintenance schedules are prepared, enforced and that maintenance is performed as scheduled. Compliance with preventative maintenance schedules is imperative.

See Enclosure 2.

(7) Estimating. Estimating met the standards satisfactorily for the month of July.

---

b. Equipment Maintenance: (Satisfactory- 74%)

(1) Overall, this area performed satisfactorily during the month of July even though there was a significant span in the individual QAE numerical ratings. In the E&C shop most tasks were performed correctly and in a professional and timely manner resulting in a raw score of 85%. The remainder of the equipment maintenance functions were rated 72% (Satisfactory).

(2) Documentation (work orders) still has a high error rate and are not being completed correctly nor are man-hours charged correctly. Labor charges to the correct work order using the correct category code needs emphasis to correct this problem.

(3) SAMS data entry needs improvement.

(4) Maintenance of the wash rack continued to be a problem this month however it appears a solution is in process.

(5) Continued emphasis is required for properly reporting non-mission capable downtime and preparing reports. There is no evidence of analyses by the supervisory/production control personnel to correct this problem. Printing and submitting the monthly SAMS report is not meeting the goal of this task. The PWS clearly states what is required.

See Enclosure 3.

c. Environmental: (Satisfactory 75%)

The contractor is satisfactorily performing Environmental tasks. Much improvement has been made in the yard however, continues to need improvement. The 90-day yard needs to be cleaned and maintained as a matter of routine. Labels and documentation significantly improved during the month of July. Responsiveness was rated very good. A good working relationship between the government and the contractor in this area has been established.

See Enclosure 4.

d. Transportation: (Excellent 93 %)

(1) Freight Section. The contractor has steadily improved since the contract start date and is rated outstanding in this area (95%). There was a change in personnel (the supply/trans manager) the latter part of June resulting in the movement of the freight technician to the supply activity. The contractor's packing and crating technician has been cross-trained to do the freight tasks and is accomplishing the tasks well.

(2) Passports/Port Calls/Unit Movements. This area has improved since the contractor trained and certified a second employee in the passport section. This has allowed the contractor to more effectively utilize his personnel resources.

(3) Fleet, Fuel and GSA Management. This work continues to present some problems for the contractor. He has had a turn over in personnel, which caused delays in system utilization. At the end of the month of July the contractor still has not obtained a password for the manager to access the automated fuel system (FAS) to perform these tasks for fuel billings. The government has followed up with the contractor on this

subject at least twice since April. The contractor's employee is willing to learn and perform but does not have the system access required.

(4) Up until this point the contractor has done limited data entry support for the ITO for deployments and exercises (Bright Star). Full performance on the part of the contractor is required in this area. The contractor's reliance on the government Installation Transportation Officer (ITO) to orchestrate future exercises and deployments must cease. The ITO in turn must completely relinquish these tasks to the contractor.

See Enclosure 5.

e. Supply Services: (Satisfactory 70%)

(1). Some of the key personnel in this work center have been moved (or terminated) to solve problems in this work center. Overall performance of this work center has improved as a result of the personnel changes the contractor has taken.

(a) The contractor did not perform the monthly IMPAC Credit Card Reconciliation on time. This is unacceptable and has been the norm since the contract start date. The new supervisor must resolve this on going problem since it could result in penalty and interest charges or cancellation of credit cards for delinquent payments for the government. The personnel change the contractor has made has not resolved this problem to date. The government and contractor management teams should review this function and seek resolution to this ongoing issue. This was rated as unsatisfactory which impacted negatively on the overall rating.

Recommend: The contractor takes immediate corrective action to ensure that the credit card reconciliation is performed correctly and on time. Late penalties and/or interest that have accrued should be charged back to the contractor.

(b) The contractor's performance has improved in this area. There is still a need for his personnel to receive additional training in the use of IFS and SARSS. The contractor has assigned his workforce to specific functions within the supply arena which should help reduce the current backlog and customer complaints created as a result of the practice used prior to this rating period to "float" the employees from one area to another as priority demanded. There continues to be an unacceptable number of errors in the SARSS-1 and IFS systems. The overall effect of bouncing employees around from section to section has caused

customer complaints, backlog, system lock ups, duplicates and actions not being taken to correct errors in the system for the past 5 months. Stability in the property bookwork center has been noted since the supply technician in the property book has been assigned specifically to that work site. The work achieved in the property book section has been excellent once the contractor initiated methods to ensure stability and continuity to achieve daily work requirements.

(c) ASP support has been excellent. Noteworthy is the effort made by the contractor's warehousing personnel to prepare the ASP for the Department of Defense Explosive Safety Board Inspection (DDESB) on 17 July 2001.

See Enclosure 6.

f. Quality: (Unsatisfactory 60 %)

HVAC work continues to be unsatisfactory. This has been an on going deficiency.

Recommend: Shop supervisory personnel become more involved in QC during the work process to ensure quality work/services prior to completion of the work in the shops. Supervisory involvement and QC enforcement of standards during "work-in-progress" is needed.

g. Timeliness: (Unsatisfactory 69%)

There has been improvement in most of the work centers however, This area continues to need improvement to meet the established/required Standards.

II. Quality Control (QC):

a. System Implementation and Maintenance: (Unsatisfactory 65%)

Automation Support rated satisfactory 73% for July. This area needs improvement in the customer service arena. Customer satisfaction was rated unsatisfactory. Too many complaints concerning "attitude" on the part of the contractor have been logged. Data entry and systems support tasks were rated good and very good respectively. Technical expertise seems to be satisfactory however 'attitude' brought this rating down because of poor customer service skills. The contractor's QC program has not yet reached satisfactory performance even though there has been a slight improvement. There continues to be too many errors in the STAMIS'. This is not attributable to systems problems but rather attributed to lack of knowledge by the operators. The contractor's system office has some

responsibility to train and assist with their in house training needs. Improvement is needed in customer service/satisfaction.

See Enclosure 7.

b. Corrective Action: (Unsatisfactory 65 %)

The contractor provided his QC SOP on 1 April 2001. It began and continues to be less than satisfactory. The Quality control methods identified in the QC SOP have not been met. The contractor should place emphasis on "prevention" rather than "resolution" after a problem arises.

c. Documentation, Records, CDRLs, and Reports: (Unsatisfactory 65 %)

No change since last report. The Quality control methods identified in Griffin Services, Inc. QC Plan have not been met. The Contractor is not performing the Quality Control program satisfactorily. There are two personnel assigned to this function. Follow-up Quality Control reviews are not being performed as should be. The contractor must emphasize QC responsibility at the supervisory level and monitor training needs (as applicable) in his QC section.

Recommend: The contractor place emphasis on his QC program.

III.Technical Management:

a. Staffing and Personnel: (Satisfactory 70%)

This area remains a challenge for the contractor. His workforce is not yet stabilized nor have they demonstrated appropriate skill levels to perform the work in some of the work centers. Changes made the latter part of June in the management structure were/are expected to show a marked improvement in work performance. That has not yet become evident.

b. Problem Resolution and Communication: (Satisfactory 79%)

There has been significant improvement in this area since assignment of the new Project Manager. The government is hopeful that this area will continue to improve over the next few months until there is a seamless, one team work force.

c. Efficiency: (Unsatisfactory 65%)

The contractor has not demonstrated efficiency in several of the work centers. Work scheduling, reporting and subsequent analysis of the reports has not occurred. To date efficiency and effectiveness to ensure overall satisfactory performance is not evident. Poor efficiency and effectiveness is apparent particularly in the facilities HVAC and grounds maintenance operations. Technical expertise is also lacking which negatively impact the efficiency, effectiveness, quality and timeliness of these work centers.

d. Safety: (Unsatisfactory 65 %)

No change. The Contractor has provided his Safety Plan to the government however there appears to be very little substance to the plan. The contractor has had several accidents involving injuries and unnecessary damage to equipment. The contractor must ensure understanding of the safety provisions on the part of the workforce and ensure compliance by all in order to meet this requirement satisfactorily.

Recommend: That the contractor review his Safety Plan with an eye for law and regulatory compliance and ensure that all levels of the workforce understand the requirements. A system should be put in place to hold supervisors and employees accountable for practicing and enforcing safety policies.

IV. Business Management:

a. Local Autonomy: (Satisfactory 70%)

Improved. The on-site Project Manager's Office has integrated into the government management team and has been responsive to the government and customer complaints. Further he is seeking resolution to problems. Communication from that office has improved. Slowly cooperation and teamwork among the contractor and government key personnel is occurring. The new PM thus far has demonstrated he is decisive, cooperative, has established good rapport with the government staff and is determined that this will be a successful venture. He will need a short period of time to put corrective or alternative procedures in place and assign personnel best suited to perform.

b. Management and Employee Relations: (Unsatisfactory 60 %)

No change. At the end of this rating period there has been no information provided to the COR addressing the contractor's programs for employee incentives or his social and economic programs. The contractor continues to have a high turnover rate within his workforce. Too many

employees do not demonstrate qualifications for the tasks they have been given to do. Employees appear on the worksite ill prepared to accomplish the job to completion. Contractor follows up and communication with the customer or the government representatives has been inadequate in some cases. The on board workforce has not yet been stabilized. Frequent reassignments have occurred.

c. Contract Management: (Unsatisfactory 50%)

The contractor has not met the terms of the contract satisfactorily. Problems remain unresolved. Responses and actions are untimely and there are too many customer complaints for non-performance or unacceptable quality of work. Much of the work in specific functional areas (as discussed above) has been incomplete, untimely and costly to the government. Too many government personnel continue to feel they must "shore up" the contractor's efforts and cause the work to be done. Bringing in outside vendors or doing the work they has accomplished this. These are not acceptable options.

d. Government Property: (Very Good 85 %)

No change. The Property Administrators (both government and Griffin Services) have established a good working rapport for ensuring control, inventory and management of government property. Procedures are in place and open communication lines have been established between the two offices.

V. Budget and Cost Control:

a. Efficiency: (Unsatisfactory 63%)

The contractor's personnel utilization, ability to recruit and retain a qualified, professional, workforce accomplishing work tasks in a timely manner has not been met. Accomplishing work correctly, completely and on time continues to need improvement. The rating for this work center during the month of July has been unsatisfactory.

b. Budget Program and Cost Control: (Unsatisfactory 69%)

The contractor continues to do a good job of cost accounting and data collection to capture costs in sufficient detail to allow for further government analyses. During this period though, they have done a poor job of cost control, particularly in the facilities maintenance area.

c. Cost Verification and Allocation: (Unsatisfactory 69%)

The contractor's variance analyses provide detailed justification for budgetary deviations. In the area of facilities maintenance, their explanation that they over-hired in the area of grounds maintenance and HVAC to improve the government's perception of their proficiency and underbid in other areas is unacceptable.

Electrical, plumbing and incidental service requirements were rated very well; HVAC and grounds services were rated unsatisfactory. These unsatisfactory ratings impacted negatively on the overall rating for the month of July.

d. Budget Programming and Cost Control: (Unsatisfactory 64%)
Reviewed. See Para 5 (b) above.

See Enclosure 8.

4. For additional information concerning this report contact is Marvin E. Head, (404) 464-4451, Bldg 181, Fort McPherson, GA.

Encls (8)

Marvin E. Head
Contracting Officer's Representative (COR)
PWS Contract Administration Office
Installation Support Service Center (ISSC)

**INSTALLATION SUPPORT SERVICES CENTER**
**Contract DAKF11-00-C-0006**
**Griffin Services, Inc.**
**Award Fee Board**

**Scope of Evaluated Work**
**16 January 2001 - 28 February 2001**

1. General Contract Information. Contract DAKF11-00-C-0006 is a cost-plus award-fee (CPAF) contract to perform Installation Support Services for Fort McPherson, Fort Gillem and U.S. Army Recreational Area - Lake Allatoona, Georgia, including AR 5-9 area of responsibility, Inter-Service Support Agreements (ISSA), Memorandums of Understanding (MOU), Memorandums of Agreement (MOA) and designated tenant units. The contract was awarded to Griffin Services, Inc. of Atlanta, Georgia on 13 October 2000 based on competitive proposals. The current estimated value of the contract is $22,938,345.44. Contract performance is a 12-month base period with a 6-week acceleration phase. The contract contains four one-year option periods. Performance period including all options shall be through 28 February 2006.

2. Contract Scope of Work. The major functional areas included in the Performance Work Statement are: Supply and Services; Environmental Services; Real Property Operations, Maintenance, Repair, Construction and Other Related Services; Transportation Services; Equipment Maintenance Services and Administration and Automation.

3. Evaluated Work. The award fee evaluation covers work performed during the acceleration period of 16 January 2001 - 28 February 2001. The acceleration period did not include the total of all functional areas.

4. Evaluations. As specified in the Award Fee Plan, the fee evaluation is based on evaluation of contractor performance reported by the Contracting Officer's Representative (COR) and the Quality Assurance Evaluators (QAE), as well as evaluations performed by contract administration personnel. The COR currently appointed by the Contracting Officer and submitting evaluation reports for the specified rating period is Mr. Marvin Head, USAG Fort McPherson, DIS, Fort McPherson, GA. The COR and his designated QAEs perform monthly evaluations in accordance with the Government quality assurance surveillance plan. The COR assigns the numerical ratings monthly for the sub criteria.

AFZK-IS-OF 18 June 2001

MEMORANDUM for Commander, Forces Command, Army Atlanta Contracting Center, (AFLG-PRC/MR. Jesse Watkins), Building 130, 1301 Anderson Way, Fort McPherson, GA 30330-6000

SUBJECT: Consolidated Performance Evaluation for DAKF11-00-C-006, ISSC Support center, Fort McPherson, GA. Accelerated Performance Period, 16 January 2001 through 28 February 2001.

1. Attached as Enclosure I, is the performance evaluation for the subject period, submitted by the Installation Service Support Center, Fort McPherson, GA.

2. Based on the summary at paragraph 7, the overall performance of the contractor for the accelerated period fails to meet minimum contract requirement. The rating for this period is 63.19%. UNSATISFACTORY supported by the enclosed documentation and observation by the government's Quality Assurance Evaluators.

3. On 6 December 2000, the Government identified several functions that required an earlier start date prior to the full performance date of I March 2001. This action was a result of the early loss of Government personnel accepting employment elsewhere and early retirement. A start date of 16 January 2001 was agreed upon between the contractor and the Government. The proposed start date was agreed upon due to the time required to recruit personnel, loss of time due to the Christmas and New Years Holidays and the unavailability of the incumbent labor force. The majority of the positions requiring placement were for public works, which involved skilled journeyman. Outside hiring would be necessary and would have an adverse impact, less time for orientation and familiarization. Many of the skilled government positions were already vacated and no turnover period was available.

4. The contractor began bringing aboard key personnel and hiring for the accelerated labor positions. The contractor submitted his Technical Proposal, Cost Narrative and Cost Proposal for the period for the Governments review. The contractor indicated that the accelerated start date would be dependent on several issues, the effectiveness of recruitment, early agreement on his proposal and the governments' expeditious handling of security clearances, which are usually delayed by systemic problems within the agency granting the clearances.

5. A 100% property and equipment inventory was conducted during the start-up period, with tools, buildings, vehicles and other equipment identified in the PWS for the accelerated areas being turned over to the contractor. (See enclosure 2).

6. During this acceleration period the contractor's work has been less than acceptable as evidenced by the summary and other supporting documentation. Government

employees are still performing several key functions. Additionally the contractor is experiencing a high turnover rate for key labor positions. The Government had indicated to the contractor, early on that the majority of the incumbent labor force would not be available and that the Atlanta area would be difficult to recruit and retain qualified craftsmen based on his low pay for skilled labor positions. This has already proven to be true as he continues to employ untrained and less than qualified personnel.

7. The following is a summary for the accelerated functional areas:

I Performance of Work:

(a) Real Property: Unsatisfactory - 65%

The contractor has faced many problems in this area as a result of his not being able to recruit the incumbent work force. He has had to rely on the local labor market and was told by the Government early on that he would have difficulty in recruiting qualified personnel in the Atlanta labor market, especially since he is only paying Department of Labor (DOL) wage rates which are far below those of a skilled, experienced journeyman, (boiler operators, HVAC personnel, plumbers and carpenters etc.) can earn in Atlanta.

In the beginning of the accelerated period many work orders requiring HVAC could not be accomplished by the Contractor due to lack of HVAC personnel. (See CDR, Enclosure I). Much of the work being performed lacked good troubleshooting skills as evidenced by work order DG034IIIR. The Griffin employees at building 200 do not understand how to reset fire alarms and require an escort since they do not have security clearances. Improper use of government equipment, SO#Ga029081R was returned due to the lack of qualified operator for the bucket truck which requires a specially licensed operator. Work had to be sub-contracted. These are just a few examples of the many problems being experienced throughout the facilities portion of the PWS. There are many incidents corrected on the spot and gone unreported.

It is understood that problems will continue to arise until the contractor can establish a good solid team, however the revolving door will continue to plague his efforts due to the low pay being offered. It is clearly understood what the DOL rates are low and a survey of the market would quickly support this claim. Roads and Grounds maintenance was unacceptable during this accelerated time frame. The contractor was plagued with the turn over of employees in efforts to clean up the winter debris (leaves) on the two installations. Minimal grass cutting was necessary, as the season was late winter prior to spring and grass was dormant.

Two areas of concern during this accelerated period were the locksmith position and the need for the government in house workforce to provide "escorts" for contractor personnel requiring access into secure facilities (specifically Buildings 200 and 363). The locksmith position remains vacant in Griffin Services and the displaced government

employee is continuing to provide locksmith services pending hiring of a locksmith and obtaining accompanying security clearances once he is on board.

Recommendations: Contract modification should be negotiated and issued to decrease the accelerated portion of the Locksmith duties. Acceleration fees should be reduced to compensate for the government man-hours lost as a result of having to escort Griffin personnel pending security clearances.

(b) Equipment Maintenance: Unsatisfactory - 63%

Required reports are not being properly prepared in accordance with AR 700-138 and paragraph C.5.10.2.1.2 of the PWS. These reports are the responsibility of the PP&C, which was an accelerated portion of the contract. The monthly and weekly maintenance reports do not reflect the required information and are merely a roll-up of completed work orders, with labor and parts costs. No analysis of production measures was provided. (See attached CDRs at enclosure l). A large number of work orders exceeded the allotted/standard repair times, is some cases as much as 100%. This practice will adversely affect reimbursable customers as they expect to pay for the standard repair times. The standard times are in the MAC charts of all TMs and are established times based on historical data and repetitive repair of this equipment. See attached (CDRs).
Daily labor sheets were not properly reflected on the 2407 work orders nor in the SAMS automated system. Direct labor employees are charging too much time to administrative overhead. Additionally reports for non-mission capable down time were not in accordance with the requirements of the PWS C.5.10.2.1.2 and AR 738-750. No MWOs were applied during this period. (See enclosure 1).

(c) Environmental: Not applicable during this acceleration period. See attached evaluation.

(d) Transportation: Unsatisfactory - 50%

Personnel are not properly trained and the turnover rate is too high.
The lack of qualified trained personnel causes a ripple affect within this area. The fleet manager initially hired was not qualified for the position and has since been replaced. See attached evaluation. The contractor's employees have demonstrated no experience/expertise in this area.

(e). Supply services: Not applicable during this acceleration period.

(f). Quality. Unsatisfactory 69%

The contractor has not met the quality requirements of the PWS. No state of the art procedures have been introduced, specifications have not been met and

AFZK-IS-OF
SUBJECT: Consolidated Performance Evaluation for DAKF11-00-C-006, ISSC support center, Fort McPherson, GA. Accelerated Performance Period, 16 January 2001 through 28 February 2001.

applicable codes referenced in the PWS have not been complied with as evidenced by the attached CDRs at enclosure I.

(f) Timeliness: Unsatisfactory - 65%

The contractor has not provided good response time in support of scheduled and non-scheduled tasks. Preventative maintenance time frames established for the services as stated in the PWS have not been met. (See enclosure 1, real property).

II Quality: Control: Quality Control Plan not required during this period

III Technical Management:

(a) Staffing and Personnel: Unsatisfactory - 65%

During the accelerated period the contractor was able to recruit and fill most of his critical positions, however the locksmith position remains unfilled. Many of the personnel hired barely meet minimal position requirements, lacking the experience to accomplish even minor tasks. The DIS has received an unnecessarily high number of customer complaints concerning the ability or acceptance of responsibility to accomplish work. The SAMS production control clerk had no prior experience with this system and had to be trained by the incumbent clerk. Some of the vehicle mechanics hired had only organizational experience and no experience repairing heavy equipment at the DS/GS level. The vehicle fleet manager demonstrated no ability of how to perform the duties and subsequently departed 28 February 2001. Additionally, the locksmith position has not been filled. The government has lost valuable in house man-hours due to the need to provide escort services to the contractor personnel into secure facilities pending the contractor employees obtaining required security clearances.

Recommendation: Contract modification should be negotiated and issued to decrease the acceleration portion for the GSA Fleet/Fuel Management.

The contractor is and will continue to experience a high turnover of his labor force due to low pay, even though he is paying DOL rates, as stated previously he will have difficulty hiring good skilled employees at those rates. This turnover will have an adverse affect on his ability to provide timely and cost effective support to the installation customers. The qualification problem is evidence by enclosure (I) with supporting CDRs. The real property area seems to be suffering most. There is no indication at this time that the situation will improve under full performance implementation of the contract.

(b) Problem Resolution and Communication: Unsatisfactory –50%

AFZK-IS-OF
SUBJECT: Consolidated Performance Evaluation for DAKF11-00-C-006, ISSC support center, Fort McPherson, GA. Accelerated Performance Period, 16 January 2001 through 28 February 2001.

The contractor's project manager's decision to have minimal communication has curtailed recommendations.. Channels utilized for communication usually are DIS attempting to find out if, when or why something was done or not done to include incorrectly done. DIS was not informed of unforeseen problems, potential problems nor offered solutions other than being told each time they were informed of a problem/complaint "We will take care of it", yet never did.

(c) Efficiency: Unsatisfactory - 65%

There continues to be a great deal of non-productive time, (enclosure I and supporting CDRs). Man-hours charged to repairs continue to exceed allocated repair times recognized by industry standards, MAC charts and historical data. See CDRs. The contractors reporting system is the Standard Army Maintenance System (SAMS) and Installation Facilities System (IFS). The contractor does not have STAMIS skilled personnel at the present time with the myriad Army systems in use in the DIS.

The contractor seems to be capable of doing well with IFS because he was able to hire a former government employee familiar with the IFS system. A government incumbent trained the SAMs operator to do the work after the acceleration period began. The contractor employee had no experience on the SAMS system. Current government observations is that the SAMS operator needs to be more focused and responsive to ensure that data is entered (1) timely (2) completely/accurately and (3) on a daily basis since this will affect the installations reimbursable customers and the monthly financial report required by the Director of Resource Management.

The contractor needs to become more efficient in performing his work tasks. The contractor needs to inform the Government as to how he plans to improve on these areas where the work is not satisfactory and also inform the government in areas of exceptional accomplishments. There has been minimal interface between the government DIS staff and the contractor's Project Manager's Office. In most instances, those communication exchanges have been initiated by the government, which is not deemed acceptable.

(d) Safety: No score required at this time

The Contractor's safety plan is not due until 29 March 2001. However the following items of interest have been noted during this period. Contractor personnel have been observed either operating, or being trained to operate, equipment by unlicensed personnel. (See CDRs attached at enclosure (I)). Contractor employees requiring safety shoes and other safety related items have been given funds by the contractor to purchase those items. We have not observed any fire evacuation plans posted in buildings that he is operating from. The only building currently having fire extinguisher checked is building 400, Fort Gillem. The contractor appears to be complying with the "NO SMOKING" policy within Government buildings, however his employees have been observed smoking in GSA vehicles, which is prohibited by GSA reg.