(3). The Quality Assurance (QA) does not appear to be well organized yet. Housekeeping needs to be improved in this area. Files need to be established and maintained.

(4). The Wash rack needs immediate attention to ensure that it is properly maintained. (Encl 2, CDR).

(5). Continued emphasis is required for properly reporting non-mission capable downtime and preparing reports. There is no evidence of analyses by the supervisory/production control personnel to correct this problem. Printing and submitting the monthly SAMS report is not meeting the goal of this task. The PWS clearly states what is required.

(6). Housekeeping in the shop needs to be improved.

(7). The E&C Shop continues to improve and is providing good support.

(8). The "awaiting shop" line is empty and there is very little backlog. There is a supposition from the COR office that the incoming workload has experienced a sharp decrease in the past four months.

Recommend: The workload in the Equipment Maintenance facility be reviewed to ensure that there is adequate work to justify the number of contractor employees in this work center. The PWS should be reviewed in this area to determine whether changes are required since the following work is subcontracted to local area vendors and not being performed within the Maintenance facility: (1) Wet cell batteries (2) Tire Services (3) Hydraulics (4) Fuel & Electric Component Rebuild (5) Assemblies/Subassemblies. Work not being performed should be identified, removed form the PWS and contract costs adjusted accordingly.

See Enclosure 2.

c. Environmental: (Unsatisfactory 68%)

The DIS environmental office inspected the Hazardous Waste Yard on 5 June and found drums/containers not labeled. The yard is the biggest problem at this time. Otherwise, the contractor is doing a good job on documentation and record keeping. Workmanship needs a lot of work to bring this function up to a satisfactory level. The working relationship between the government and the contractor in this area is good. See Enclosure 3.

d. Transportation: (Very Good 84 %)

(1). Freight Section. The contractor has steadily improved since the contract start date and is rated very good in this area (88%). There was a change in personnel (the supply/trans manager) on 17 June resulting in the move of the freight technician to the supply activity. The contractor's packing and crating technician has been cross-trained to do the freight tasks.

(2). Passports/Port Calls/Unit Movements. This area has improved since the contractor trained and certified a second employee in the passport section. This has allowed the contractor to better utilize his personnel resources.

(3). Fleet, Fuel and GSA Management. This work continues to present problems for the contractor. He has had a turn over in personnel, which caused delays in system utilization. At the end of the month of June the contractor was still awaiting a password for the manager to access the automated fuel system (FAS) to perform these tasks for fuel billings. The contractor is willing to learn. Additional training is required for the manager on the new CAPITILIAZATION System (Army Unique Transportation System).

See Enclosure 4.

e. Supply Services: (Unsatisfactory 63%)

(1). Some of the key personnel in this work center have been on the rolls since the contract start up date yet, were still not capable of full performance at an acceptable level at the end of four months of the contract. Some employees have been moved several times in an attempt to resolve some of the problems in this area. Overall performance of this work center needs immediate improvement.

(a). The contractor did not perform the monthly IMPAC Credit Card Reconciliation on time. This is unacceptable and has been the norm since the contract start date. The new supervisor must resolve this on going problem since it could result in penalty and interest charges or cancellation of credit cards for delinquent payments for the government. The contractor has made personnel changes, which may resolve this problem.

Recommend: The contractor take immediate corrective action with his Supply Manager to hold him responsible for ensuring that the monthly credit card reconciliation is performed correctly and on time. Any future

reoccurrence of untimely processing resulting in penalties and interest or cancellation of credit cards be charged back to the contractor.

(b). Griffin did not have a supply technician to operate the SARSS-2A, UIT, Rapid DODAAC and CBS-X function. Since LOGSA, Huntsville, AL ruled they would not grant a password to a contractor for systems access into the UIT, DODAAC and CBS-X systems, these functional areas were changed in April to bring them back under the government as in-house work and removed from the PWS. Operation of the SARSS-2AC was also requested to be omitted from the contract.

Recommend: All funds associated with these functions since 1 March 2001 be withheld as payment due to Griffin Services. The contractor bid these functional areas, yet he could not obtain necessary clearances to perform the tasks.

(c). The contractor has not performed the duties at the stock record account satisfactorily. Receipts have not been processed in a timely manner causing delays in vendor payments and complaints. There continues to be an unacceptable number of errors in the SARSS-1 and IFS systems. The contractor does not have trained, personnel in supply operating the various levels of supply and their corresponding supply systems. The Supply manager has not demonstrated he possesses the experience and knowledge to train his employees to perform the required work. The overall effect of bouncing employees around from section to section has caused customer complaints, backlog, system lock ups, duplicates and actions not being taken to correct errors in the system for the past 4 months. Stability by the end of June in the property book was noted when the contractor did finally recognize the need to assign an employee to the property book function. This area is expected to continue to show improvement.

(d). The contractor has continued to have system input and operation problems with the SARSS 1 box. Excessive errors and system "lock ups" are unacceptable.

Recommend: That the contractor review the skill level, experience and qualifications of the supply workforce to determine what training is required to bring this work center up to a satisfactory level of performance. Unresolved problems or delays in this area impact on other work centers being able to perform satisfactorily.

See Enclosure 5.

f. Quality: (Unsatisfactory 60 %)

The HVAC incidents described in paragraph I (a) (1) above concerning the unfinished work and messy conditions left at the worksite are examples of the lack of quality.

Recommend: Shop supervisory personnel become more involved in QC during the work process to ensure quality work/services prior to completion of the work in the shops. Limited demonstrations of key personnel (supervisory) involvement during "work-in-progress" has caused some of the problems that could have been avoided had the contractor's management team performed satisfactorily.

g. Timeliness: (Unsatisfactory 65 %)

There has been some improvement in some of the work centers however, This area continues to need improvement to meet the established/required Standards.

II. Quality Control (QC):

a. System Implementation and Maintenance: (Unsatisfactory 60 %)

There are entirely too many errors throughout the DIS on the STAMIS, particularly SARSS in supply and IFS. This is not attributable to systems problems but rather attributed to lack of knowledge by the operators. The contractor's system office has some responsibility to train and assist with their in house training needs. The QAE received many complaints of errors in IFS hitting on the financial side. This has created an unnecessary workload for the government's budget section requiring them to manually move and adjust funds.

See Enclosure 6.

b. Corrective Action: (Unsatisfactory 60 %)

The contractor provided his QC SOP on 1 April 2001. April was the first month for the contractor's Quality Control program. It began with less than satisfactory results. The Quality control methods identified in the QC SOP have not been met.

C. Documentation, Records, CDRLs, and Reports: (Unsatisfactory 60 %)

The Contractor provided his Scheduled Inspections and record keeping on all his quality control problems for the month of June.

The Quality control methods identified in Griffin Services, Inc QC Plan have not been met. The Contractor is not performing the Quality Control program satisfactorily. There are two personnel assigned to this function. Follow-up Quality Control reviews are not being performed as should be. The contractor must emphasize QC responsibility at the supervisory level.

III. Technical Management:

a. Staffing and Personnel: (Unsatisfactory 65 %)

This area remains a challenge for the contractor. His workforce does not demonstrate the appropriate skill levels to perform the work in some of the work centers. Changes made the latter part of June in the management structure (which should also result in changes in the workforce) are expected to show a marked improvement in this area.

b. Problem Resolution and Communication: (Unsatisfactory 50%)

There has been no improvement in this area since the first monthly report. The government is hopeful that this situation will immediately change based on the assignment of Mr. Charlie Geer as the Project Manager.

c. Efficiency: (Unsatisfactory 60 %)

The contractor has not demonstrated efficiency in several of the work centers. Work scheduling, reporting and subsequent analysis of the reports has not occurred. To date efficiency and effectiveness to ensure overall satisfactory performance is not evident. Poor efficiency and effectiveness is apparent particularly in the facilities HVAC operation, grounds maintenance and supply. Technical expertise is also lacking which negatively impact the efficiency, effectiveness, quality and timeliness of these work centers. Qualified supervisory and key personnel appear to be lacking also. If the supervisor/key employee does not possess the technical nor managerial expertise to perform the work to which he/she has been assigned, they cannot train nor effectively manage a subordinate workforce, determine shortfalls and implement corrective actions. This is a serious concern to the government managers.

Recommend: The contractor review technical qualifications, interpersonal relationship and managerial skills of the key and supervisory/leader employees to ensure that the assigned personnel are qualified and suited for the tasks they have been assigned.

d. Safety: (Unsatisfactory 65 %)

The Contractor has provided his Safety Plan to the government however there appears to be very little substance to the plan. The contractor has had several accidents involving injuries and unnecessary damage to equipment. The contractor must ensure understanding of the safety provisions on the part of the workforce and ensure compliance by all in order to meet this requirement satisfactorily.

Recommend: That the contractor review his Safety Plan with an eye for law and regulatory compliance and ensure that all levels of the workforce understand the requirements. A system should be put in place to hold supervisors and employees accountable for practicing and enforcing safety policies. The Garrison's Safety Office has expressed concerns to the DIS and to the contractor's Project Manager.

See Enclosure 7.

IV. Business Management:

a. Local Autonomy: (Unsatisfactory 65 %)

As of 30 June 2001 Griffin Services, Inc. has not successfully met the contract full performance standards. The contractor's efforts thus far are not not not not not not not not not not not efficient, effective nor within reasonable timeframes to the degree the government expected after four full months of operation. The on site Project Manager's Office has not integrated into the government management team, responded to complaints in a reasonable time nor offered solutions when problems arose. Communication from that office is almost non-existent. Lack of communication, cooperation and teamwork among the contractor and government key personnel has continued. With the departure of the on site Project Manager at the latter part of June and assignment of the Business Manager into the PM position, we expect an immediate turn around of the problems experienced in the past. The new PM is decisive, cooperative, has established good rapport with the government staff and is determined that this will be a successful venture. He will need a short period of time to put corrective or alternative procedures in place and assign personnel best suited to perform.
During the end of June, The Corporate Office demonstrated they are dedicated to successfully perform this contract by initiating changes in key leadership positions, raising the government's expectations and performance rating towards t he end of the month for this area.

b. Management and Employee Relations: (Unsatisfactory 50 %)

At the end of this rating period there has been no information provided to the COR addressing the contractor's programs for employee incentives or his social and economic programs. The Project Manager has thus far failed to address his resolution for obtaining and retaining a qualified workforce. The contractor continues to have a high turnover rate within his workforce. Too many employees do not demonstrate qualifications for the tasks they have been given to do. Employees appear on the worksite ill prepared to accomplish the job to completion. Contractor follows up and communication with the customer or the government representatives has been inadequate and there have been complaints of shoddy, unprofessional work and workers. The on board workforce has not yet been stabilized. Frequent reassignments have occurred.

c. Contract Management: (Unsatisfactory 40 %)

The contractor has not met the terms of the contract satisfactorily. Problems remain unresolved. Responses and actions are untimely and there are too many customer complaints for non-performance or unacceptable quality of work. Much of the work in specific functional areas (as discussed above) has been incomplete, untimely and costly to the government. Too many government personnel continue to feel they must "shore up" the contractor's efforts and cause the work to be done. Bringing in outside vendors or doing the work they has accomplished this. These are not acceptable options.

d. Government Property: (Very Good 85 %)

The Property Administrators (both government and Griffin Services) have established a good working rapport for ensuring control, inventory and management of government property. Procedures are in place and open communication lines have been established between the two offices.

V. Budget and Cost Control:

a. Efficiency: (unsatisfactory 60%)

The contractor's personnel utilization, ability to recruit and retain a qualified, professional, workforce accomplishing work tasks in a timely manner has not been met. Accomplishing work correctly, completely and on time continues to need improvement. The rating for this work center during the month of June has worsened significantly.

b. Budget Program and Cost Control: (Unsatisfactory 55%)

The contractor continues to do a good job of cost accounting and data collection to capture costs in sufficient detail to allow for further government analyses. During this period though, they have done a poor job of cost control, particularly in the facilities maintenance area.

c. Cost Verification and Allocation: (Unsatisfactory 65%)

The contractor's variance analyses provide detailed justification for budgetary deviations. In the area of facilities maintenance, their explanation that they over-hired in the area of grounds maintenance and HVAC to improve in these areas is to improve the government's perception of their proficiency is not sufficient justification to explain why costs have so greatly exceeded the budgeted amount (cost overrun in excess of $135K).

d. Budget Programming and Cost Control: (Unsatisfactory 55%)
Reviewed. See Para 5 (b) above.

See Enclosure 8.

4. For additional information concerning this report contact is Marvin E. Head, (404) 464-4451, Bldg 181, Fort McPherson, GA.

Encl (8)

Marvin E. Head
Contracting Officer's Representative (COR)
PWS Contract Administration Office
Installation Support Service Center (ISSC)