of $4,486 is claimed. To the best of GSI's knowledge and belief, all increased estimated costs associated with this change have been billed under the contract, but on information and belief, some of these costs have not yet been paid and form part of the August 2003 invoices "Disputes."

**5. Contingency Support.** The PWS in the RFP upon which award of this contract was based identified an estimated 160 hours of contingency support requirements for each annual period of contract performance, and GSI's proposal submitted in response to the RFP included an estimate of 160 hours of General Maintenance Worker time to accommodate this work. The GSI proposal accepted for award of this contract included estimated costs of $2,855 for the Base Year and $2,925 for Option Year 1.

As expressed in the PWS, the requirements for contingency support clearly were "over and above" effort, and the PWS workload estimate of 160 hours per year was approached as a level-of-effort tasking for the contract, i.e., actual time worked in excess of 160 hours per year for contingency support effort would form the basis for equitable adjustment of the contract pricing. After the events of September 11, 2001, contingency support type work under the contract increased dramatically, causing GSI to expend far in excess of the 160 hours originally contemplated by the contract. Total estimated direct costs for the first contract year were increased by $38,060, based on information transmitted to the Government on June 26, 2002, along with the apportioned Management and Support direct costs of $4,948 associated with the cost increase for direct effort. However, the Government never formally acknowledged the existence of contingency support requirements, even though the work met the qualifying criteria set forth in the PWS.

A direct cost increase for Option year 1 has not been included in this claim because records showing the actual contingency support hours worked are not presently available to GSI. While we are aware that work continued for efforts such as placement and movement of the 200 new concrete barriers delivered to the base as a result of heightened security efforts, we have not included an estimate of the costs associated with such work because after the initial efforts related to heightened security, it is difficult – if not impossible – to attribute work to contingency support with any precision.

For this area of our claim, GSI believes that the Contracting Officer failed to take appropriate action to direct performance for contingency support in accordance with the terms of the PWS. GSI also believes that the Contracting Officer failed to recognize that contingency support requirements had arisen, despite receiving written notification from GSI that such requirements had been performed and were increasing the costs of contract performance. Further, GSI believes that the Contracting Officer's failure to recognize the existence of valid contingency support requirements adversely affected GSI's performance evaluations in the award fee determination process because the nature of contingency support dictates assigning high priority to this type of work, which affects other work being performed under the contract. With no modifications to the contract addressing contingency support work and no indications from the Government that award fee determinations considered either the existence of high priority, contingency support requirements or the effects of these requirements on other aspects of performance, GSI believes that the Government's award fee evaluations were based on something other than the true facts and circumstances surrounding contract performance.

The additional fee claimed for this portion of our claim amounts to $2,477 and to the best of GSI's knowledge and belief, all increased estimated costs associated with this work have been billed and reimbursed by the Government.

**6. Roads & Grounds.** Our claim for additional fee associated with increased estimated costs of performance for Roads & Grounds work is based on extra work performed as a result of the imposition of unreasonable standards for acceptance that reflected performance beyond the requirements of the contract and Government prescription of the method and manner of performance.

The express requirements of the contract called for mowing improved grounds a maximum of once per week during the summer months, but the Government repeatedly required GSI to mow areas such as the parade field three times per week, and more frequently on some occasions. From actions taken by the Contracting Officer's Representative (COR) staff, GSI believes that inspections of work performed were improperly based on a standard calling for maintenance of grass height at a specified level. However, the contract PWS clearly called for grass mowing to be performed at specific intervals, depending upon the time of year, with mowers set to achieve a specified height. There simply was no requirement in the PWS to maintain grass at a specific height.

The contract also contained no requirements for edging the areas mowed by GSI, but GSI was repeatedly criticized for failure to edge the mowed areas. The Government actually had at least one active, separate contract with another, local contractor (WORKTEC) that included requirements for edging, but for some reason, GSI frequently was held accountable whenever edging had not been performed, even though such requirements did not form part of GSI's contract with the Army. The Government also required GSI to clean leaves from the nature trail at the base on a daily basis, even though this type of an area would seem more appropriately considered unimproved grounds, which required service much less frequently. Additionally, the Government also required GSI to perform plant trimming, mowing or clean-up in areas outside the limits of the base that did not appear to be covered at all by the specifications of the contract PWS.

A significant problem in Roads & Grounds performance seemed to stem from the lack of specific maps detailing the areas in and around the base facilities that were considered Levels 1, 2 or 3 areas, which reflected improved grounds (Level 1), semi-improved grounds (Level 2) and unimproved grounds (Level 3). Requirements for contract performance were established on the basis of whether an area was designated Level 1, 2 or 3. GSI requested maps and other detailed information concerning this throughout contract performance, but such information never was provided. Instead, whenever it was expedient or otherwise convenient for the COR staff, GSI was tasked to perform, regardless of the actual terms of the GSI contract. When GSI did not perform, the Government issued Contract Deficiency Reports (CDRs), regardless of whether or not the alleged "deficiency" represented work actually required by the contract.

Verbal feedback received from the Government in connection with award fee evaluations and the written information received in connection with the award fee evaluation covering the period from September 2001 through November 2001 consistently indicated the

Griffin Services

Government's dissatisfaction with performance in the Roads & Grounds area. However, GSI strongly disagrees with the Government's criticisms because they are based almost wholly on requirements that did not form part of GSI's contract with the Army.

The individual instances of changed work are too numerous to track for this work area, and precise identification of actual costs incurred for the second year of performance is practically impossible since the Government owns the work records. However, for purposes of this claim, the increase to estimated costs for the Base Year is based on information transmitted to the Government on June 26, 2002, which identifies additional labor costs and additional subcontractor costs incurred as a result of trying to satisfy the COR staff and avoid receiving further CDRs. The increase to estimated costs for Option Year 1 is based on comparison of staffing and estimated costs originally proposed for that period with the Project Manager's estimate of staffing and actual labor costs during Option Year 1. As with the other components of this claim, Management and Support apportioned effort also has been included at the rate of 13% along with corporate G&A of 4% of total direct costs to calculate the total increased estimated costs associated with this extra work.

The additional fee claimed as equitable adjustment for this area amounts to $18,097. To the best of GSI's knowledge and belief, all increased estimated costs for this change have been billed to the Government and reimbursed under the contract. Further discussion of the effects of this changed work on the evaluation of GSI performance in the award fee determination process appears in item 8, below.

**7. Special Events Support.** The PWS in the RFP upon which award of this contract was based included an informational estimate of 200 hours for special events support that could be expected during an annual period. As with the Contingency Support claim narrative in item 5, above, GSI approached this performance element as a level-of-effort tasking to be implemented by the Government during performance. However, unlike the situation outlined in item 5, above, GSI included no estimated costs or staffing to accommodate special events support because this work was not represented by a separate CLIN and the nature of any special event support requirements could affect several different CLINs under the contract.

Calculating the total number of hours associated with special events support is complicated by the fact that the direct hours expended by the workers involved in preparation and tear-down efforts for the event are not the only hours really allocable to the overall costs of support. Additional hours by personnel who do not provide support directly during the preparation and tear-down efforts are spent in planning meetings, and these hours are not always reflected as time against the special event account. For example, in support of the Army birthday during the Base Year of contract performance, the Project Manager and other personnel attended at least three planning meetings prior to commencing the actual work performed in support of the event. All of this was further complicated by the fact that the Contracting Officer failed to recognize special events support requirements at any time during contract performance, even though events such as the Army birthday celebration enjoyed wide publicity throughout the base community.

For this claim, increased estimated costs are based on labor hours identified in internal GSI memoranda by the Project Manager during performance and average labor rates reflecting the types of personnel typically involved in special events support, as shown in the attached

pricing information. The claimed additional fee is $1,784, which represents 6% of increased estimated costs. To the best of GSI's knowledge and belief, all increased estimated costs associated with this change have been billed to the Government and reimbursed under the contract.

**8. Total Contract Fee adjustment as a result of a cardinal change to the contract.** [in progress]

We request that a final decision of the Contracting Officer be issued within 60 days from the date this claim is received. As required by the Contract Disputes Act of 1978, I certify that:

- This claim is made in good faith;
- The supporting data are accurate and complete to the best of my knowledge and belief;
- The amount requested accurately reflects the amount owed for which VT Griffin Services, Inc. believes that the Government is liable; and
- I am duly authorized to certify this claim on behalf of VT Griffin Services, Inc.

Should you have questions regarding the above or require further information, please contact me at (770) 952-1479, extension 236, or by email at michael@griffinserv.com.

Sincerely,
VT Griffin Services Inc.

Michael L. Gulino
President and Chief Operating Officer

Enclosures: a/s