DEPARTMENT OF THE ARMY
ARMY CONTRACTING AGENCY, SOUTHERN REGION
1309 ANDERSON WAY SW,
BLDG 131
FT MCPHERSON GA 30330-1096

19 SEPTEMBER 2004

Southern Region Contracting Center

VT Griffin Services
Attention: Mr. Michael L. Gulino
5755 Dupree Drive NW
Atlanta, GA 30327

Subject: Contract Number DAKF11-00-C-0006 – Request for a Final Decision of the Contracting Officer

Gentlemen:

We are in receipt of your claim in the amount of $434,921.00 dated July 20, 2004.

In your claim there were eight areas of concern whereby you requested relief. We have diligently researched the areas identified and your requests and our concurrence or rebuttal is as follows:

1. Supply and material purchases required to be accomplished by Griffin Services, Inc. (GSI) during performance, claim for $118,111. The Government agrees and approves the fee in the amount of $118,111.

2. Bollard maintenance change, claim for $5,007. The Government agrees and approves the fee of $5,007.

3. Litter removal at Fort Gillem, claim for $4,212. The Government agrees and approves the fee of $4,212.

4. Swimming pool water treatment and boiler work changes, claim for $4,486. The Government agrees and approves the fee of $4,486.

5. Contingency support changes, claim for $2,477. The Government agrees and approves the fee of $2,477.

6. Roads and grounds claim for $18,097. The Government agrees and approves the fee of $18,097.

7. Special events support, claim for $1,784. The Government agrees and approves the fee of $1,784.

8. Total contract fee adjustment, claim for $280,747. Total claim for $280,747 is denied. The terms and conditions of a contract cannot be changed through the claims or appeal process, which means that we are not authorized or allowed to change from a Cost plus Award

Subject: Contract Number DAKF11-00-C-0006 – Request for a Final Decision of the Contracting Officer

Fee contract to a Cost plus Fixed-Fee contract after the contract is complete. The Government does agree that the Award Fee Pool should have been $166,503 and $167,228 for the base year and option year respectively. When recalculated this change amounted to an additional award fee in the amount of $102.

The Government will agree to payment in the amount of $154,276 as settlement of this claim.

While the Government is in agreement with the method for figuring the requested claim amounts and are in agreement with the payment of such, we do not support the belief that GSI's cost control efforts were outstanding and contend that technical performance was and remained the prominent factor in denial of additional Award Fees.

Please submit invoice to the Contracting Officer in the amount of $154,276 so that payment may be made to cover the above-identified items.

This is the final decision of the Contracting Officer. You may appeal this decision to the Armed Services Board of Contract Appeals (ASBCA). If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the ASBCA and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the ASBCA, you may solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the ASBCA, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime contracts) within 12 months of the date you receive this decision.

If we can be of further assistance please advise. If GSI would prefer payment via Government credit card in lieu of payment via the Defense Finance and Accounting Service please advise by contacting Mr. Jesse Watkins at 404-464-4111.

Sincerely,

K. Jan Stowell
Contracting Officer

VT
Griffin Services

**CERTIFIED MAIL RETURN RECEIPT REQUESTED**

September 30, 2004

Ms. K. Jan Stowell
Contracting Officer
Department of the Army
Army Contracting Agency, Southern Region
Southern Region Contracting Center
AACC/AFLG-PRC
1301 Anderson Way, S.W.
Fort McPherson, Georgia 30330

**Re: Contract No. DAKF11-00-C-0006 – Request for a Final Decision of the Contracting Officer**

Dear Ms. Stowell:

On July 20, 2004, VT Griffin Services, Inc. ("GSI") submitted a claim seeking a total of $434,921.00 in equitable adjustments and fees owed for performing the above-referenced contract. Included in that claim were eight items, the first seven of which are not a part of this correspondence as they are being separately addressed. Item eight of that letter was a claim for an award fee adjustment in the amount of $280,747.00. On September 19, 2004, GSI was notified by letter that the Army had agreed to adjust the award fee in the amount of $102.00 to correct the Army's miscalculation of the base and option year Award Fee Pools. With the exception of this mathematical correction, however, the Army refused to increase the Award Fee, despite the merits of GSI's claim.

This contract was an A-76 conversion, and the competition for award of the contract was based on an RFP from 1998. The PWS included with the RFP appears to have been based on performance data that pre-dated the issuance of the RFP by at least one year, and very likely longer. The original award of the contract contemplated a Phase-In period of three months. However, soon after award of the contract to GSI, the Army approached GSI with requirements to accelerate Phase-In and assume full performance earlier than contemplated by the contract. A major cause of the requirement to assume full performance early was the unanticipated departure of Government personnel from the facilities supported, and GSI eventually agreed to commence acceleration toward full performance on/about January 16, 2001 rather than conduct an orderly,



VT Griffin Services Inc.
5755 Dupree Drive, NW
Atlanta, Georgia 30327
P: (770) 952-1479
F: (770) 859-0410
www.griffinserv.com

VT Griffin Services

Ms. K. Jan Stowell
September 30, 2004
Page 2

GSI wanted to respond to the Army's requirements for acceleration of the contract start-up, and we engaged in what we considered to be a productive dialogue toward this end in December 2000 and early January 2001. Modifications P00001 and P00002 of the contract ultimately were negotiated and issued as bilateral, supplemental agreements to the contract in March 2001, and despite the events that had transpired during the early phases of the acceleration period prior to execution of P00001 and P00002, GSI was hopeful that the performance objectives of the contract would be pursued as a Government-contractor team effort. They weren't. And in the most classic sense of "if we knew then what we know now," had we known then what we were about to find out, GSI might never have agreed to accelerate the Phase-In, and it certainly would not have tolerated even the slightest failure of the Army to live up to its end of the bargain with respect to the terms of the contract. The Fort McPherson A-76 conversion was a classic, hostile conversion where the Army's actions during contract performance transcended resistance and assumed the character of subversion.

The first indication of a hostile A-76 conversion occurred approximately ***one hour*** into the accelerated Phase-In period. Now, bearing in mind that GSI was turning its corporate organization upside down in an attempt to accommodate a Government problem of unanticipated attrition, it seemed incongruous that at 9:14 AM on the first day of accelerated Phase-In, the Fee Determination Official, LTC Mark Abernathy, would send an email to the Contracting Officer, the GSI Project Manager, the President of GSI, the Chairman of the Board of GSI, and a representative of USAG-DIS that starts out, "While I understand that we are very early in the accelerated phase-in of the contract, the initial indications are not very good." LTC Abernathy's email concluded noting, "as soon as possible we all need to sit down and go over these issues," giving this email the appearance of a *de facto* cure notice. But truthfully, what rock had LTC Abernathy been hiding under during the exhaustive discussions between GSI and various representatives of Fort McPherson that had transpired the previous December and earlier in January? The "issues" outlined in LTC Abernathy's email had been discussed, and GSI believed that in view of the overall situation, the Army would cooperate with the contractor during performance of the contract. But this simply proved to be untrue.

At many critical junctures in the course of contract performance at Fort McPherson, the Army not only failed to cooperate with GSI, but also failed to recognize the facts and circumstances surrounding contract performance and the terms of the contract itself. For example, as noted in our letter of July 20, 2004 requesting a final decision of the Contracting Officer, the Army completely abrogated its responsibilities to provide supplies and materials during contract performance, and then in award fee determinations throughout performance, the Army saw fit to downgrade GSI's performance even though the root cause for material-related performance delays resided with the Army rather than with GSI. On other fronts, when it suited Army performance evaluators, they proffered interpretations of contract requirements that were

VT
Griffin Services

Ms. K. Jan Stowell
September 30, 2004
Page 3

inaccurate and unfounded – as in the case of imposing requirements to maintain grass at a specified height during the growing season when, in fact, the contract's Performance Work Statement clearly called for grass mowing to be performed at specified intervals with mowing equipment set at specified heights.

Through all of this, the Contracting Officer was of no assistance in maintaining equitable treatment of the contractor. An express responsibility of Contracting Officers in the U.S. Government is to "ensure that contractors receive impartial, fair, and equitable treatment" (FAR 1.602-2(b)), but numerous modifications to the contract that changed the contract's pricing, terms and conditions were not even tendered to GSI for agreement and signature, and numerous other instances where modifications to the contract were specifically requested were ignored by the Contracting Officer. And throughout performance, when GSI responded to a multitude of CDRs (Contract Deficiency Reports) – the vast majority of which inaccurately cited the actual requirements for contract performance, if they related to bona fide contract performance requirements at all – the Contracting Officer failed to act to get the issuers of these bogus CDRs to cease and desist from issuing similar CDRs in the future.

To demonstrate the extent of the Army's bias exhibited against GSI in this regard during contract performance, at a mid-year staff meeting in 2002 with the Garrison Commander at Fort McPherson – COL Harold Cooney – attended as well by, among other personnel, GSI's Project Manager and the COR for the Fort McPherson contract, Mr. Marvin Head, the Garrison Commander asked the COR, "How do you communicate with the contractor (GSI)?" The COR's response was, "With CDRs." As the head goes, so goes the body, which probably goes a long way toward explaining why GSI was issued an extraordinary number of CDRs throughout performance that did not reflect the requirements of the contract and most certainly did not comply with the guidance of the Army's Quality Assurance Plan (QASP).

One problem with the QASP was that the Army did not believe it was required to follow the guidelines established in it. In a series of emails between GSI and the contracting office, the Contracting Officer stated to GSI's Project Manager on September 12, 2002 that the QASP "could be changed 5 times a day if I want to," but the point of the earlier communications was that the Army was not following the QASP in the issuance of CDRs. While GSI acknowledges that the QASP could be changed as many times as the Army desires to change it, the fact remains that until it is changed, it should be the guiding document for prosecution of the Army's inspection efforts, and it wasn't. Although not a contractual document, *per se*, the QASP outlined how the Army would inspect services performed and it provided the contractor with some insight into what the limits of acceptable performance would be. It also indicated when issuance of CDRs would be appropriate. However, since the QASP was not observed by Army evaluators during contract performance, GSI believes that serious questions arise with respect to the weight given to CDRs issued that do not reflect the surveillance plan. In several instances

VT Griffin Services



during contract performance in response to CDRs issued by the Army, GSI pointed out that according to the QASP, the level of performance was within established tolerances indicating that issuance of a CDR was inappropriate. The Army's canned response was that it didn't matter, which GSI disputes.

A significant consequence of all this was that the award fee determination process used to evaluate GSI's performance under the contract was flawed to the point of being arbitrary and unreasonable, based on erroneous performance data and biased against the contractor. For two years, GSI was scratching its corporate head wondering what it needed to do to get a favorable performance rating from the Army at Fort McPherson. But it could not even obtain the basic information needed to develop and implement effective plans of action.

GSI repeatedly had requested written feedback from the Army on award fee evaluations during contract performance, but the Army repeatedly refused to provide written feedback. On January 25, 2002, after numerous written requests for written feedback on previous award fee decisions, GSI's Director of Operations submitted a formal request for a final decision of the Contracting Officer seeking receipt of written feedback for the previous two award fee periods. The Contracting Officer ignored the request for a final decision as a formal request under the "Disputes" clause and never responded with a final decision. Eventually, GSI was provided written feedback covering only the award fee period immediately preceding GSI's request for a final decision – September 2001 through November 2001. Further written feedback on award fee evaluations was never provided to GSI, but the written feedback from the one award fee period provided was replete with inaccurate characterizations of performance with respect to the actual requirements of the contract, to the point where GSI must question whether the Army actually conducted award fee evaluations at all in accordance with the terms of clause H.3, "Award Fee Evaluation," which, unlike the QASP, was a formal part of the contract.

Since the Army's award fee assessments of GSI performance under the contract appear to have been reflected in past performance data related to GSI performance at Fort McPherson, as part of this claim, GSI specifically requests that the Government provide records covering each award fee determination period applicable to the overall contract period of performance, from March 1, 2001 through February 28, 2003, excluding the period of September 2001 through November 2002, for which GSI was provided written records of the evaluation. The reason for this request is that GSI has suffered injury in competitions for award of other contracts as a result of what we believe to be improper evaluations based on erroneous data that did not reflect the actual requirements for GSI performance under the Fort McPherson contract.

Regarding the specific relief of $280,747 additional fee requested by GSI in this claim, GSI has calculated this amount on the basis of 85% of the award fee pool through Modification P00018, exclusive of the reduction made to the award fee pool for the Base Year in Modification P00017.