VT Griffin Services

Ms. K. Jan Stowell
September 30, 2004
Page 5

The basis for entitlement is that a cardinal change to the contract occurred during contract performance in which the actual contract performed was transformed into something very, very different from the contract contemplated by the contracting parties at the initial award of the Fort McPherson contract. As outlined in our claim of July 20, 2004, the Army's failure to provide timely supplies and materials, and the many changes to contract performance imposed unilaterally, without equitable adjustment, coupled with the Army's questionable assessments of contractor performance, refusal to cooperate with the contractor and, at times, active subversion of the inspection terms of the contract clearly indicate that GSI is entitled to the relief requested in this claim.

Notwithstanding the Army's initial rejection of element 8 of our claim of July 20, 2004, GSI believes that the following additional information, which came to our attention after filing our initial claim, further provides an opportunity for the Army to reconsider its decision and comply with the terms of the contract. Accordingly, GSI hereby reasserts and supplements its claim for an adjustment of the award fee in the amount of $280,747.00 and offers the following information in support of a Contracting Officer's Final Decision granting such an adjustment.

1. **The Army's Failure To Evaluate The Effects Of Extra Work Due To Changes on GSI's Performance For Purposes of Determining Award Fee Earned Was Arbitrary And Unreasonable**

According to the express terms of the contract, the Army was required to evaluate GSI's performance before making any determination about the award fee GSI earned. The contract specifically stated that "[t]he amount of the award fee earned for each evaluation period .... shall be determined by the Government's subjective evaluation of the Contractor's performance." Section H.3(1). The contract went on to describe the performance criteria that would serve as the basis for determining the amount of the award fee, including (1) performance of work; (2) quality control; (3) technical management; (4) business management; and (5) budget and cost control. Section H.3(2). In addition, there were numerous subfactors identified under each of these performance criterion that also were to be considered. *Id.* The contract further stated:

> The Government will perform a monthly evaluation of the Contractor's performance according to criteria stated above. The Government may elect to allow the Contractor's input in the monthly evaluation if the Government deems such input would clarify or explain significant occurrences or Contractor actions. It is anticipated that evaluations will be conducted quarterly. After evaluation is complete the Government will meet with the Contractor to discuss the results of the evaluation. The intent of

VT Griffin Services



> this meeting is to reach a common understanding of the level and adequacy of the contractor's performance. Contractor performance shortcomings and successes will be openly and frankly discussed with the overall intent of improving mission support. The Government may provide recommendations on methods for performance improvement, however acceptance or implementation of any such recommendation rests solely with the Contractor and shall [not] relieve the Contractor from the requirement of meeting any or all requirements of the contract.

Section H.3(3). It therefore is indisputable that the contract mandated that the Army perform monthly and quarterly evaluations, and meet with GSI to "openly and frankly" discuss any performance shortcomings and successes.

Notwithstanding the fact that the contract required the Army to evaluate GSI's performance on a consistent and timely basis, and discuss those evaluations with GSI, the Army nonetheless steadfastly has refused to disclose details concerning the evaluation results, if there are any. In fact, after repeated requests, GSI was actually forced to file a formal claim in order to receive the Army's award fee evaluation results. Even then, the Army responded by providing only the evaluations for September 2001 through November 2001. With the exception of those three months, the Army inexplicably has refused to provide any other performance evaluations to GSI.

The particularly troubling aspect of the Army's failure to provide GSI details on the evaluations is the fact that the written evaluations for that one period (September 2001 through November 2001) were so plagued with inaccuracies and purported criticisms of performance unrelated to the contract requirements that the evaluation fails to comply with the contract's evaluation criteria and is arbitrary and unreasonable. From the written evaluations provided for the period September 2001 through November 2001, it appears that the Army treated award fee determinations as a deductive process, akin to what would be prosecuted under an "Inspection of Services" clause. However, even if treatment as a deductive process were appropriate, any decision to deduct from the award fee based on these evaluations lacks a rational basis. *See, e.g.*, *Appeals of Apex Internat'l Mgmt. Servs. Inc.*, ASBCA Nos. 44647, 38241, 38242, 41365, 42747, 43971, 43222, 38087; 94-2 BCA 26842 (Mar. 4, 1994) (finding that the Government's invoice deductions for work performed under an O&M facilities contract were recommended "arbitrarily, indiscriminately, and without justification" therefore "the Government has not met its burden of establishing its entitlement to any of the deductions other than those which appellant admitted were proper and does not question, and those deductions must be set aside").

VT Griffin Services

Ms. K. Jan Stowell
September 30, 2004
Page 7

### 2. THE ARMY'S FAILURE TO EVALUATE GSI'S PERFORMANCE BEFORE DETERMINING THE AWARD FEE EARNED AMOUNTED TO A BREACH OF CONTRACT FOR WHICH GSI IS ENTITLED TO DAMAGES

Because the contract expressly mandated that the amount of award fee earned be determined based on the Army's evaluation of GSI's performance, the Army's decision to award fees without performing the evaluations constituted a breach. On January 25, 2002, GSI specifically requested a final decision of the Contracting Officer in order to obtain Army records covering each award fee determination period applicable to the overall contract period of performance, but the only records of award fee evaluations provided to GSI covered the period of September 2001 through November 2001. We have yet to receive any other documentation whatsoever to support the Army's award fee determinations or to support the conclusion that the Army actually conducted the required evaluations of GSI performance from January 2001 through February 2003 in accordance with the terms of the contract. Accordingly, it can be adversely inferred that, with the exception of the period from September 2001 to November 2001, no evaluations were performed during the duration of the contract. *See, e.g., Appeal of T&M Distribs., Inc.*, ASBCA No. 51279; 01-2 BCA ¶ 31442 (June 5, 2001) (stating that "there is a fundamental rule of evidence that where certain facts are peculiarly within the knowledge of one of the parties, the possessor of this knowledge may be required to come forward with evidence concerning these facts, and a failure to do so raises an inference that the facts are unfavorable to the possessor's case").

The Army's failure to conduct the required evaluations amounted to a breach of the contract that damaged GSI and resulted in an unreasonable award fee amount that lacked a reasonable basis. GSI therefore is entitled to its damages for the breach. *Id.* (noting that the Government's breach of a contract for O&M facilities services entitled the appellant "to receive traditional breach of contract damages, including anticipatory profits"); *see also Appeal of Hernandez*, ASBCA No. 53011; 01-2 BCA ¶ 31550 (July 25, 2001) (stating that "[t]he purpose of damages for breach of contract is to compensate the injured party for the loss caused by the breach").

### 3. THE ARMY BREACHED THE CONTRACT BY FAILING TO INCREASE THE AWARD FEE TO COMPENSATE GSI FOR THE MULTITUDE OF CONTRACT CHANGES AND THE CUMULATIVE IMPACT OF THOSE CHANGES

Throughout GSI's performance of the contract, the Army made numerous unilateral changes that significantly increased the amount of work performed, the amount of time required to perform, and the costs for performance. In addition, the Army failed to cooperate with GSI and engaged in conduct that further hindered GSI's performance. The Army's conduct and multiple changes caused disruptions and delays that impeded contract performance through no fault of GSI's. Yet, the Army failed to consider the cumulative impact of its conduct and changes when determining

VT Griffin Services

Ms. K. Jan Stowell
September 30, 2004
Page 8

the award fee. As a consequence, the Army's award fee determination was unreasonably low. Although the Army has agreed to make equitable adjustments to compensate GSI for discrete changes, no equitable adjustment has yet been made to the total award fee to account for the cumulative impact of the additional work, disruptions, and delays caused by the Army. GSI is entitled to such an adjustment and the Army's failure to make this adjustment constitutes a breach of the contract.

As a preliminary matter, although the Changes Clause permits the Army to make unilateral changes, the Federal Acquisition Regulation ("FAR") states that "[c]ontract modifications, including changes that could be issued unilaterally, shall be priced before their execution if this can be done without adversely affecting the interest of the Government." 48 C.F.R. § 43.102(b) (emphasis added). In contravention of this policy, the Army repeatedly made unilateral changes to the contract without making any attempt at all to negotiate the pricing for equitable adjustments.

Furthermore, the contract's Changes Clause mandated that "[i]f any such change causes an increase or decrease in the estimated cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, or otherwise affects any other terms and conditions of this contract, the Contracting Officer shall make an equitable adjustment in the (1) estimated cost, delivery or completion schedule, or both; (2) amount of any fixed fee; and (3) other affected terms and shall modify the contract accordingly." 48 C.F.R. § 52.243-2(b). As we explained in our prior claim letter, the Army persisted in making unilateral changes to the contract without making an equitable adjustment to the contract pricing, delivery, or other terms and conditions. The Army's failure to make equitable adjustments in response to the unilateral contract changes constituted a breach.

In addition, it is well established that "the Government has an implied duty to cooperate with the contractor and not hinder his performance." *Appeal of Atlantic Dry Dock Corp.*, ASBCA Nos. 42609, 42610, 42611, 42612, 42613, 42679, 42685, 42686, 44472; 98-2 BCA ¶ 30025 (Sept. 25, 1998). Nevertheless, from the outset of GSI's performance, the Army engaged in conduct that impeded our ability to perform in a timely and cost-effective manner and foreclosed any possibility of a collaboration that would ensure the success of the contract. The Army personnel involved with this contract obviously harbored resentment that the facilities services were converted from Government personnel to a private contractor through the A-76 acquisition process. The Army's animus is exemplified by the *de facto* "cure notice" e-mail Lieutenant Colonel Mark Abernathy sent only one hour into contract performance and Marvin Head's comment to the Garrison Commander during a mid-year staff meeting in 2002 that he communicated with GSI by issuing CDRs. In addition, the Army refused to provide GSI with maps identifying which grounds on the base were deemed Level 1, 2, or 3 so that GSI could properly monitor the level of required contract services applicable to a designated area. Army

VT Griffin Services



personnel also arbitrarily issued CDRs that penalized GSI for work that was not required by the contract. These are but several of what we believe further proceedings would reveal to be many examples of conduct displaying an express enmity toward GSI and an intentional effort to obstruct GSI's performance.

Beginning with the first month of performance, the Army hindered GSI's performance by failing to timely provide Government-furnished property that was required for performance. As we explained in our claim, the Solicitation for this contract expressly stated that the Army would provide the supplies and materials required for performance. *Solicitation Amendment 0002* (stating that "it is the Government's intent to require the contractor to rely exclusively on the U.S. Army supply system for supplies and materials required for performance under this contract."). However, GSI's attempts to procure needed supplies and materials through the Army supply system were without success because the Army would not respond in time. GSI therefore was forced to go out and buy the necessary supplies and materials. As a result, GSI incurred unplanned costs for labor to manage the purchasing activities, receive, inspect, and accept deliveries, and engage in other supply processing functions, including screening the Army supply system. In addition, the Alternate Contracting Officer's Representative failed to transfer required supplies in a timely manner, which also obstructed GSI's performance.

It was not until the second year of performance that the Army finally took action and issued Modification P00011, which added one Full-Time Equivalent ("FTE") for purchasing and $150,000 to contract estimated costs. Modification P00011 did not, however, make any adjustments to the award fee to account for the additional work and increased costs related to GSI's requirement to purchase supplies and materials. Even more disconcerting is the fact that GSI was criticized for performance delays and increased contract costs that patently were the direct result of the Army's failure to provide the supplies and materials promised under the contract.

In addition to failing to provide the needed supplies and materials, the Army also added requirements to the contract that were not part of the original bargain and required GSI to perform in a manner that deviated from that called for by the contract. For example, the Army directed GSI to monitor and treat swimming pool water, edge mowed areas, perform mowing at increased intervals, trim plants, mow and clean areas outside the base, and clean leaves from the nature trail on a daily basis, among other things. As indicated above, the Army even went so far as to require GSI to maintain the grass at a specific height, even though the contract's Performance Work Statement clearly required mowing at specified frequencies. GSI also was forced to perform contingency and special events support services that vastly exceeded the anticipated labor hours required by the contract. None of these numerous new requirements were part of the original bargain. All of these new requirements significantly increased the labor, time, and costs for performance and forced GSI to modify its plans and procedures for

VT Griffin Services



performance. More importantly, these new requirements amounted to substantial changes that adversely impacted GSI's performance of all other requirements under the contract.

In totality, the Army's breaches and changes outlined in GSI's claim had a cumulative impact that so disrupted GSI's performance that it materially altered the nature of the contract. GSI therefore is entitled to compensation for this cumulative impact independently from any equitable adjustments to which it is entitled for individual changes. *See Appeals of Atlantic Dry Dock, supra* ("[V]iewed together, the added work here did materially alter the parties' bargain."). GSI therefore seeks an adjustment to the award fee earned in the amount of $280,747.00, which reflects 85% of the Award Fee Pool through Modification P00018, excluding the reduction made to the Award Fee Pool for the Base Year in Modification P00017, as shown in the table presented on the next page.

| | Base Year | Option Year 1 | Total |
|---|---|---|---|
| Base Fee – Contract as modified through P00018 | $83,251 | $71,992 | $155,243 |
| Award Fee Pool – Contract as modified through P00018, excluding reduction made in P00017 | $166,503 | $167,228 | $333,731 |
| Subtotal – Contract Fees (Base + Award) | $249,754 | $239,220 | $488,974 |
| Less Base Fee Billed | -$83,251 | -$71,992 | -$155,243 |
| **TOTAL UNBILLED FEE** | **$166,503** | **$167,228** | **$333,731** |
| Award Fee adjustment to compensate GSI for breaches and cumulative impact of changes | $141,528 | $142,144 | $283,671 |
| Less Base Fee distributed and billed | -$2,924 | -$0 | -$2,924 |
| **NET ADDITIONAL FEE CLAIMED** | **$138,604** | **$142,144** | **$280,747** |

I certify that this claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which GSI believes the Government is liable; and that I am duly authorized to certify the claim on behalf of GSI.

GSI requests that if the Army does not agree that GSI is entitled to an equitable adjustment for the reasons set forth above, a Contracting Officer's Final Decision be promptly issued pursuant

VT Griffin Services



to the Contract Disputes Act. If you have any questions at all, or you need further information, I welcome you to please contact me directly at 678-564-2815. You also may reach me by e-mail at michael.gulino@griffinserv.com.

Lastly, we would like to point out that while it is understood that the Performance Assessment Report (PAR) is a separate issue from the claims discussed above, we are eager to review and discuss the draft PAR. Our goal is to resolve all outstanding issues related to this contract amicably and as expeditiously as practicable. It is requested that the draft PAR be sent to me at your earliest convenience.

Thank you for your time and immediate attention to this matter.

Sincerely,
VT Griffin Services Inc.

Michael L. Gulino
President and Chief Operating Officer

C: Judd Juha
Lars E. Anderson, Esq.